Joshua M. Masur (SBN 203510)
 *jmasur@zuberlawler.com*
Rasheed M. McWilliams (SBN 281832)
 *rmcwilliams@zuberlawler.com*
Jarod M. Bona  (SBN 234327)
 *jbona@zuberlawler.com*
Jon F. Cieslak  (SBN 268951)
 *jcieslak@zuberlawler.com*
**ZUBER LAWLER & DEL DUCA LLP**
350 S. Grand Avenue, 32nd Floor
Los Angeles, California 90071
Telephone: (213) 596-5620
Facsimile:  (213) 596-5621

Jayashree Mitra (*Pro Hac Vice to be filed*)
 *jmitra@zuberlawler.com*
**ZUBER LAWLER & DEL DUCA LLP**
One Penn Plaza, Suite 4430
New York, NY 10119
Telephone: (212) 899-9830


Attorneys for Plaintiff
NOVUS ANTI-AGING CENTER, INC.,
on behalf of itself and all others similarly
situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| NOVUS ANTI-AGING CENTER, INC., on behalf of itself and all others similarly situated,<br><br>    *Plaintiff,*<br><br> *v.*<br><br>SEXUAL MD SOLUTIONS, LLC,<br><br>    *Defendant.* | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**(1) UNLAWFUL AGREEMENT TO RESTRAIN TRADE (15 U.S.C. § 1)**<br>**(2) UNFAIR COMPETITION (Cal. Bus. & Prof. Code § 17200)**<br>**(3) UNJUST ENRICHMENT** |

Plaintiff Novus Anti-Aging Center, Inc. ("Novus") alleges the following upon actual knowledge with respect to itself and its own acts and upon information and belief as to all other matters:

**NATURE OF THE ACTION**

1.      Novus brings this class action complaint under the Sherman Act, 15 U.S.C. § 1, and California law against Defendant Sexual MD Solutions, Inc. ("SMDS") to stop an anticompetitive scheme by SMDS and third parties Tissue Regeneration Technologies, LLC ("TRT") and General Patent, LLC ("General Patent") that harms both doctors and patients by limiting treatment options for erectile dysfunction.

2.      Novus is a medical clinic that treats patients with erectile dysfunction using therapies including extracorporeal shockwave therapy ("ESWT"). ESWT is a non-invasive treatment that uses acoustic energy to stimulate the formation of new blood vessels and increased blood flow to the treatment area.

3.      SMDS and TRT are competitors who provide ESWT Programs for the treatment of erectile dysfunction—i.e. combinations of devices that produce shockwaves, treatment protocols, and marketing services—to the medical providers who treat erectile dysfunction patients. TRT is a medical technology company that develops, manufactures, and sells ESWT devices, as well as licenses medical providers to treat erectile dysfunction under the "SoftWave" brand. SMDS markets the competing "GAINSWave" brand for ESWT devices and treatments.

4.      Despite both TRT and SMDS having competing ESWT brands, they have forsaken their competitive positions and have executed a formal agreement with multiple anticompetitive purposes and effects: (a) to not compete with each other, (b) to set a price floor for licensing the GAINSWave brand, (c) to jointly target other competitors with knowingly baseless assertions of patent infringement, and (d) to impose unreasonable restrictions on licensees to prevent them from using any other ESWT technology to treat erectile dysfunction.

5.     As a result of the anticompetitive scheme by TRT and SMDS, the price of these treatment programs has increased and the quality of these programs has decreased for Novus and the Classes. Moreover, but for defendant's anticompetitive conduct, the Classes would have more choices for treatment programs to offer to their patients.

## PARTIES

6.     Plaintiff Novus Anti-Aging Center, Inc. is a California corporation with its principal place of business in Studio City, California.

7.     Defendant Sexual MD Solutions, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

## JURISDICTION AND VENUE

8.     This Court has primary subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 because this action arises under the antitrust laws of the United States. The Court has supplemental jurisdiction for the state law claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as the federal claim.

9.     This Court has diversity jurisdiction for this action under 28 U.S.C. § 1332 because Plaintiff Novus is a citizen of California and, on information and belief, Defendant SMDS and its members are citizens of Florida, and the matter in controversy exceeds the sum or value of $75,000.

10.     SMDS is subject to the Court's personal jurisdiction pursuant to California's long-arm statute because SMDS has purposefully availed itself of the privilege of conducting business activities within California. The exercise of personal jurisdiction comports with due process because SMDS has sufficient minimum contacts with California because it contracts with and services dozens of licensees in California who are harmed by SMDS's unlawful and anticompetitive acts towards its licensees, and those contacts are related to this suit.

11.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, because SMDS transacts business in this district and under 28 U.S.C. § 1392(b)(2) because SMDS committed unlawful and anticompetitive acts against its licensees and other medical providers who use ESWT to treat erectile dysfunction who reside in this District, including Novus.

## SUBSTANTIVE ALLEGATIONS

### I.     The ESWT-ED Market

12.     This case concerns the market for programs designed to treat erectile dysfunction with extracorporeal shockwave therapy.

#### A.     The Product Market

13.     ESWT, also sometimes referred to as low intensity shockwave therapy, uses acoustic energy to treat various ailments, including soft tissue injuries such as tennis elbow and plantar fasciitis.

14.     Although the mechanism is subject to some debate, for soft tissue injuries, ESWT works by inducing microtrauma to the affected area with repeated shockwaves, thereby stimulating neovascularization—i.e. new blood vessel formation—and promoting tissue healing. ESWT can also break up blockages in existing blood vessels that may restrict blood flow. When ESWT is used to treat erectile dysfunction, both mechanisms result in increased blood flow in the penis, thereby making it easier to achieve an erection.

15.     To accomplish this, ESWT employs brief, low-energy, high-amplitude acoustic pressure pulses that are produced by medical-grade devices. Currently, ESWT is only available from licensed medical providers in a clinical setting.

16.     ESWT is one of four treatments for erectile dysfunction. The others are oral pharmaceutical treatments such as Sildenafil (Viagra), pharmaceutical treatments that are injected directly into the penis, and surgical treatments such as penile implants.

17.     Although an erectile dysfunction patient may sometimes use one or more of the four main treatments, in part because some treatments (such as Viagra) are not effective for all patients, ESWT provides unique benefits compared to the other options.

18.     Unlike injected pharmaceutical treatments and surgical treatments, ESWT is non-invasive because it does not require physical penetration of tissue.

19.     ESWT is also unique among the four main treatment options because it treats the underlying problem causing erectile dysfunction for many patients: the loss of functioning blood vessels in the penis. Pharmaceutical treatments increase blood flow to existing, unblocked blood vessels in the penis, but they do not promote neovascularization or unblock existing blood vessels; in other words, they temporarily reverse a symptom, not the underlying cause. Penile implants do not affect blood flow at all; instead, they replace the normal operation of the penis with a mechanical implant. Thus, for many patients, ESWT is the only feasible option for treatment of erectile dysfunction.

20.     ESWT is performed by medical providers in clinics. Medical providers customarily purchase a set of services (an "ESWT Program") from an "ESWT Program Provider" in order to offer ESWT treatments for erectile dysfunction.

21.     There are multiple ESWT Programs available to medical providers wishing to provide ESWT treatments to patients with erectile dysfunction. ESWT Program Providers create ESWT Programs from some combination of (a) devices that produce shockwaves, (b) treatment protocols, (c) brand names, and (d) marketing services, which they sell to medical providers.

22.     There is a cognizable market for ESWT Programs for the treatment of erectile dysfunction (the "ESWT-ED Market").

23.     Because ESWT treatments for erectile dysfunction provide unique benefits, other treatments are not substitutes for ESWT treatments. For many patients, ESWT is the only practical or possible solution to their problems. In other

words, there is limited (and for some patients, no) cross-elasticity of demand between ESWT and other treatment options. Accordingly, programs that support other treatment options are not part of the ESWT-ED Market.

24.    Different ESWT Programs are substitutes for each other, however, even though they may have different combinations of services.  In a properly functioning, competitive market, if any ESWT Program Provider introduced a significant, non-transitory price increase, medical providers would switch to an alternative ESWT Program Provider.

### B.    The Geographic Market

25.    Medical providers across the United States provide ESWT treatments for erectile dysfunction, and they can choose an ESWT Program from an ESWT Program Provider located anywhere within the United States. Moreover, ESWT Program Providers—including Defendant SMDS and TRT—market and sell their services on a nationwide basis. Indeed, medical providers purchase these services from providers located in the United States without regard to their state or region. But for regulatory and other reasons, medical providers do not look outside of the United States for ESWT Program Providers. Accordingly, the geographic scope of the ESWT-ED Market is the United States.

## II.    SMDS Competes in the ESWT-ED Market

26.    SMDS competes in the ESWT-ED Market as an ESWT Program Provider to medical providers and clinics.

27.    While SMDS does not make, sell, or lease any medical device, it advertises, markets, promotes, and grants licenses to medical providers to provide an ESWT-based protocol for the treatment of erectile dysfunction under the GAINSWave trademark.

28.    SMDS has a standard license agreement called a "GAINSWave Membership Agreement" that it requires its medical provider licensees to sign.

29.  The GAINSWave Membership Agreement purports to impose certain obligations and restrictions on SMDS's licensees, including:

a.  Licensees must use a particular type of ESWT technology and to follow specific medical protocols and procedures when administering ESWT treatments;

b.  Licensees must participate in training, for which they must pay SMDS upfront fees;

c.  Licensees must pay monthly licensing fees to SMDS; and

d.  During the term of the GAINSWave Membership Agreement and for two years afterwards, licensees are prohibited from creating any new or different intellectual property used to market, or from participating in any group or collective marketing program that markets, the treatment of sexual wellness or related medical conditions using ESWT or similar technologies.

30.  In return, GAINSWave licensees purportedly receive:

a.  A limited license to use the GAINSWave trademark;

b.  The right to use SMDS's proprietary treatment protocols;

c.  Permission to use certain marketing materials;

d.  The benefit of SMDS's general marketing of the GAINSWave brand; and

e.  A listing in SMDS's GAINSWave provider directory.

31.  In reality, many of the purported benefits of a GAINSWave license are illusory. SMDS's treatment protocols are, in fact, not proprietary. Rather, they are just common treatment protocols that have been re-packaged by SMDS with its trademarks. Similarly, SMDS's marketing tools are comprised of nothing more than basic, commonly available information with the GAINSWave trademark applied.

32.  Nonetheless, the GAINSWave brand is the "800 lb. gorilla" in the ESWT-ED Market. SMDS has over 400 GAINSWave licensees nationwide,

3110-1003 / 1598426.1

7

substantially more than all other competitors in the ESWT-ED Market combined, and has a market share in excess of 60%.

**III.    TRT Competes in the ESWT-ED Market**

33.    TRT competes in the ESWT-ED Market as an ESWT Program Provider that both manufactures an ESWT device and markets a protocol and brand name for ESWT treatments.

34.    TRT is a medical technology company that develops, manufactures, and sells ESWT devices used to treat a variety of medical conditions. It markets its devices under its "SoftWave" trademark.

35.    TRT sells an ESWT device under the SoftWave and "Urogold 100" trademarks for urology indications, including erectile dysfunction. TRT markets the SoftWave and Urogold 100 brands as part of an ESWT Program to medical providers.  As a part of its ESWT Program, TRT also markets the SoftWave and Urogold 100 brands directly to consumers.

36.    TRT is an affiliate of General Patent, which is the owner of several patents related to ESWT technology.

37.    In particular, General Patent owns U.S. Patent number 7,601,127 ("the '127 patent"), which is titled *Therapeutic Stimulation of Genital Tissue or Reproductive Organ of an Infertility or Impotence Diagnosed Patient*.

38.    General Patent has granted TRT a sole and exclusive, royalty-free, perpetual, and irrevocable license to use and develop the '127 patent, among others.

39.    TRT has licensed at least 22 medical providers in the United States to offer SoftWave therapy using the Urogold 100 to treat erectile dysfunction.

**IV.    The Anticompetitive Agreement Between SMDS and TRT**

40.    TRT and General Patent, on the one hand, and SMDS, on the other hand, signed a license agreement (the "TRT-SMDS License Agreement") on or about September 17, 2018. Although SMDS and TRT ostensibly signed the TRT-

1  SMDS License Agreement to settle litigation between them, the purpose and effect

2  of the agreement is to unlawfully restrict competition in the ESWT-ED Market.

3      41.    The TRT-SMDS License Agreement gives SMDS and TRT market

4  power in the ESWT-ED Market based on their combined market shares, which are

5  substantially more than 60%, as well as the significant barriers to entry in the

6  ESWT-ED Market.  Existing ESWT Program Providers have invested substantial

7  resources in marketing to build brand recognition, which makes market entry more

8  difficult.

9      42.    In addition, SMDS and TRT have increased their market power through

10  deceptive and anticompetitive conduct described elsewhere in this complaint,

11  including misrepresenting the scope of the '127 patent and the inclusion of an

12  unjustified non-compete clause in the GAINSWave Membership Agreement

13      43.    The TRT-SMDS License Agreement between SMDS and TRT is an

14  anticompetitive agreement (a) to allocate the market and not compete with each

15  other, (b) to fix prices for GAINSWave licenses; (c) to jointly target other

16  competitors with knowingly baseless assertions of patent infringement, and (d) to

17  impose unreasonable restrictions on GAINSWave licensees to prevent them from

18  using any other ESWT technology or brand or competing in this market.

19      44.    The TRT-SMDS License Agreement lacks any redeeming pro-

20  competitive or efficiency value. Instead, it serves as a vehicle for TRT and SMDS to

21  jointly restrain trade, mislead medical practices throughout the country, and to harm

22  patients and doctors. And even if the Agreement had any pro-competitive or

23  efficiency benefits, it is not narrowly tailored to achieve them. Instead, it is a naked

24  price-fixing and market-allocation agreement among direct competitors that has the

25  further harm of threatening medical practices through false and misleading claims

26  and forcing them into further broad market-allocation agreements. As a result, TRT

27  and SMDS not only restrained trade among themselves, but substantially increased

28  barriers to entry through these subsequent market-allocation agreements with

medical practices and, as a result, locked away innovation in this product market. The purpose and result of their scheme is to not only agree not to compete among each other, but to keep any potential competition from entering or succeeding in the market to challenge their market power.

**A.    The TRT-SMDS License Agreement Is an Unlawful Market Allocation Agreement**

45.    The first anticompetitive feature of the TRT-SMDS License Agreement is a de facto agreement that TRT and SMDS will not compete with each other in the ESWT-ED Market.

46.    The TRT-SMDS License Agreement provides that SMDS will pay TRT a set monthly fee for each GAINSWave licensee.

47.    In addition, the TRT-SMDS License Agreement requires SMDS to increase the number of GAINSWave licensees by 150 per year, or to pay $360 per licensee below the 150-licensee threshold, in order to maintain exclusivity.

48.     TRT therefore directly benefits from an increase in GAINSWave licensees and has no incentive to promote its competing SoftWave brand, either directly to GAINSWave licensees or to the ESWT-ED Market in general.

49.    Accordingly, the TRT-SMDS License Agreement operates as a de facto market allocation agreement between SMDS and TRT, permitting SMDS to market its GAINSWave brand without competition from TRT's SoftWave brand. This is a naked market-allocation agreement because the agreement lacks any redeeming pro-competitive value and was made entirely for the purpose of restraining the market.

**B.    The TRT-SMDS License Agreement Is an Unlawful Price Fixing Agreement**

50.    The second anticompetitive feature of the TRT-SMDS License Agreement is a de facto price fixing agreement that sets a price floor for a GAINSWave license and artificially raises the price of both the GAINSWave and SoftWave licenses.

51.    The TRT-SMDS License Agreement requires SMDS to pay a fixed monthly fee to TRT for each GAINSWave licensee, whether or not the GAINSWave licensee uses TRT's ESWT device.

52.    The TRT-SMDS License Agreement further requires SMDS to pay TRT a fixed fee for each training that SMDS provides to a new GAINSWave licensee.

53.    The fees that SMDS pays to TRT increase SMDS's costs, which SMDS passes on to its licensees in the form of increased prices.

54.    Accordingly, the effect of these provisions is that the price for a GAINSWave license is artificially raised or maintained above the price that would be charged if not for the anticompetitive agreement between TRT and SMDS.

55.    These provisions create the further effect that TRT can likewise charge a supracompetitive price for a license to its SoftWave if it chooses, because it faces less price competition from SMDS, the dominant company in the ESWT-ED Market.

56.    Indeed, absent price competition from SMDS and TRT—companies with market power in the ESWT-ED Market—the price for any brand license in the ESWT-ED Market is artificially raised or maintained above the competitive level.

57.    This is a naked price-fixing agreement among competitors because it lacks any pro-competitive value and because its entire purpose is to restrain trade in the market.

**C.    The TRT-SMDS License Agreement Is an Unlawful Agreement to Assert Sham Patent Infringement Claims**

58.    The third anticompetitive feature of the TRT-SMDS License Agreement is an agreement to jointly target medical providers with knowingly baseless assertions of patent infringement in order to coerce them into paying license fees to TRT or SMDS.

59.     The TRT-SMDS License Agreement includes an agreement that SMDS and TRT will notify each other of any persons, firms, or entities that they contend are infringing the '127 patent. The agreement further provides that, once a target is identified, TRT will send a cease and desist letter and, if necessary, file a patent infringement action.

60.     Both SMDS and TRT understood that they would target any person, firm, or entity providing *any* ESWT treatments for erectile dysfunction who were not already GAINSWave or SoftWave licensees.

61.     Both TRT and SMDS know, however, that the '127 patent does not cover all types of ESWT technology and treatments and, specifically, does not cover the ESWT technology used in the GAINSWave protocol, i.e. radial wave ESWT devices.

62.     As TRT knows through its affiliation with General Patent (the owner of the '127 patent), during the patent prosecution process for the '127 patent, the inventor's patent prosecution attorney specifically argued to the United States Patent and Trademark Office that the '127 patent does not cover radial wave devices (like those used in the GAINSWave protocol) in order to differentiate the '127 patent from prior art.

63.     Knowing that the '127 patent is not valid or enforceable against most existing ESWT treatments, TRT has carefully attempted to monetize the '127 patent without putting it at risk of being found invalid or unenforceable.

64.     For example, TRT sent a letter to Medical Wave, LLP in 2018, asserting that it was infringing the '127 patent. Medical Wave, LLP responded by noting that the '127 patent does not cover radial wave devices and citing admissions to that effect made during the patent prosecution process. On information and belief, TRT did not further pursue its infringement assertion.

65.     TRT also turned its sights on SMDS. TRT filed a patent infringement action against SMDS, the only action it ever instituted to enforce the '127 patent.

66.    TRT's ruse worked against SMDS. Viewing the action as an existential threat that it could not afford to fight, SMDS did not challenge the '127 patent. SMDS instead saw opportunity and settled the claim by entering the anticompetitive TRT-SMDS License Agreement, allowing SMDS and TRT to consolidate their power in the ESWT-ED Market to the detriment of competitors, medical provider customers like Novus and the Classes, and patients.

67.    SMDS knew, however, that the patent infringement assertions it was making against competitors were baseless. Pursuant to the TRT-SMDS License Agreement, SMDS provided TRT a list of competitors to target with patent infringement claims. TRT, however, declined to send demand letters to every competitor because, as TRT admitted to SMDS, it would risk revealing that the '127 patent was invalid or unenforceable against most medical providers in the ESWT-ED Market.

68.    Notably, co-conspirator SMDS specifically admitted what it knew during this entire scheme, that "[t]he '127 patent does not cover radial wave technology" in *Tissues Regeneration Technologies, LLC, et al. v. The Anti-Aging Group, LLC, et al.*, No. 1:19-CV-04844-ELR (N.D. Ga.).

69.    Nonetheless, SMDS and TRT advanced their anticompetitive scheme to target potential competitors and customers with baseless patent infringement claims.

70.    For example, in September 2018, SMDS sent an email to GAINSWave licensees making the knowingly false claim that the '127 patent covered the use and practice of shockwave therapy for erectile dysfunction. SMDS's email further solicited GAINSWave licensees to report competing medical providers to SMDS so that SMDS and TRT can threaten the competitors with baseless patent-infringement claims.

71.    SMDS sent similar emails to other GAINSWave licensees, some of whom responded by reporting potential competitors and customers to SMDS as targets of SMDS and TRT's anticompetitive scheme.

72.     SMDS shared this information with TRT, which sent letters to some medical providers in the ESWT-ED Market, demanding that the medical providers purchase a license to use TRT's patents, either directly from TRT (along with purchasing TRT's Urogold 100 ESWT device) and by becoming a GAINSWave licensee.

73.     Meanwhile, SMDS used the '127 patent to force sales of the GAINSWave license directly, telling current and prospective licensees that a GAINSWave license was the exclusive means for obtaining protection from TRT's sham initiative to enforce the '127 patent.

74.     On information and belief, many medical providers responded to SMDS and TRT's threats and either started or continued paying unnecessary and unlawful license fees to TRT and/or SMDS.

75.     The result of these threats and this scheme was to unnecessarily increase prices in ESWT-ED Market by applying what could be considered effectively as a tax on medical professionals that were engaged in ESWT treatments throughout the country. By coercing medical practices into purchasing their ESWT Programs, SMDS and TRT effectively foreclosed competitors and potential competitors from achieving sufficient scale to effectively compete in the market. As a result, prices increased and quality decreased and medical practices had diminished choices in purchasing a treatment program.

**D.     The TRT-SMDS License Agreement Is an Unlawful Agreement to Block Other Competition**

76.     The fourth anticompetitive feature of the TRT-SMDS License Agreement is how the unlawful scheme between TRT-SMDS interacts with the terms of the GAINSWave Membership Agreement to block competition.

77.     The GAINSWave Membership Agreement contains a "Non-Circumvent and Confidentiality" provision that purports to prohibit GAINSWave licensees from creating any new or different intellectual property used to market, or

14

1    from participating in any group or collective marketing program that markets, the

2    treatment of sexual wellness or related medical conditions using ESWT or similar

3    technologies. This overly broad restriction purports to last during the term of the

4    GAINSWave Membership Agreement and for two years after its termination.

5         78.    The GAINSWave Membership Agreement attempts to justify the

6    "Non-Circumvent and Confidentiality" provision as necessary to protect SMDS's

7    proprietary business information. But, as alleged above, SMDS's business

8    information is not proprietary and it does not justify the broad protections ostensibly

9    afforded by the "Non-Circumvent and Confidentiality" provision.

10        79.    Indeed, the "Non-Circumvent and Confidentiality" provision is so

11   broad that nothing could justify it. It ostensibly prevents GAINSWave licensees

12   from participating in the ESWT-ED Market in any way if they choose to cancel their

13   GAINSWave license, essentially eliminating them from competing with

14   GAINSWave licensees or SMDS itself. This is particularly problematic and

15   anticompetitive because medical-practice doctors that treat erectile dysfunction

16   through ESWT are the most likely sources of potential competitors.

17        80.    Accordingly, the "Non-Circumvent and Confidentiality" provision is

18   nothing more than an anticompetitive attempt to lock medical providers into the

19   GAINSWave system by preventing them from switching to a new treatment

20   protocol or brand, creating a new treatment protocol, or otherwise treating patients

21   without the GAINSWave system. In this way, it operates as an unlawful market

22   allocation agreement between SMDS and medical providers who are also

23   competitors or potential competitors of SMDS.

24        81.    The "Non-Circumvent and Confidentiality" provision's anticompetitive

25   effects are amplified by the TRT-SMDS License Agreement.

26        82.    By falsely claiming that the '127 patent covers all ESWT treatments for

27   erectile dysfunction, and that GAINSWave licensees are protected from patent

28   infringement claims due to the TRT-SMDS License Agreement, SMDS and TRT

mislead medical providers about the value of a GAINSWave license and make medical providers even less likely to switch to competing brands or create their own competing products.

83.    This non-compete agreement, in many cases forced on medical practices through baseless threats of patent infringement, harms competition in the ESWT-ED Market. Competing ESWT Programs are substantially foreclosed from entering or succeeding in the market because medical practices that treat erectile dysfunction through ESWT are blocked from participating in these competing treatment programs. In addition, these same medical practices are foreclosed themselves from developing or helping to develop a competing ESWT Program, which is particularly harmful to competition as these medical professionals and practices are the most likely source of potential competition in this market. The result of this anticompetitive conduct, scheme, and agreement is that the prices for treatment programs are higher than they would otherwise be, their quality is lower than they should be, and class members have fewer options.

**E.    The TRT-SMDS License Agreement's Anticompetitive Effects Are Greater Than the Sum of Its Parts**

84.    While each of the foregoing features of the TRT-SMDS License Agreement is anticompetitive on its own, their combination compounds their anticompetitive effects.

85.    In combination, the anticompetitive features of the TRT-SMDS License Agreement give medical providers offering ESWT treatments for erectile dysfunction few options to counter SMDS and TRT's market power. Medical providers are bullied into becoming GAINSWave licensees with knowingly baseless threats of patent infringement that—particularly for a typical small medical practice—are too expensive to litigate, and find themselves stuck in a deal that overcharges them for low quality services and explicitly prohibits them from finding a more competitive option, or competing themselves. Indeed, SMDS is actively

attempting to enforce the overbroad non-compete agreements that the TRT and SMDS force Class members to sign to keep at least one competitive ESWT treatment program off the market.

**V.    Novus and the Classes Were Harmed by SMDS's Anticompetitive Agreement**

86.    The intent and result of SMDS and TRT's unlawful scheme is to hold medical providers in the ESWT-ED Market—including Novus and the Classes—captive to SMDS and TRT's combined market power and thereby extract inflated license fees.

87.    Novus is a medical clinic located in the Los Angeles area that treats, among other things, erectile dysfunction with ESWT.

88.    For 13 months, Novus licensed the GAINSWave program for treating erectile dysfunction with ESWT.

89.    During this time, not knowing about SMDS and TRT's anticompetitive agreement and conduct, Novus was overcharged for its GAINSWave license.

90.    Over time, Novus's medical personnel learned that the GAINSWave treatment protocols—which all GAINSWave licensees are required to follow—produced inferior results compared to protocols that Novus developed independently. Accordingly, in order to achieve the best results for its patients, Novus was compelled to stop using the GAINSWave protocol.

91.    In addition, Novus received no value from other supposed benefits of the GAINSWave license, including marketing materials and a marketing tool kit provided by SMDS, which were simply copied from other publicly-available sources, modified only to include the GAINSWave brand.

92.    Indeed, the only arguable value Novus derived from its GAINSWave license was the use of the trademark itself and being listed in the GAINSWave directory. Even these benefits, however, substantially lost value over time as the Los

Angeles area became saturated with GAINSWave licensees. In some cases, there were two GAINSWave licensees operating out of the same office building.

93.    Accordingly, in November 2018, Novus terminated its GAINSWave license and began offering its ESWT services under its own NOVOWave trademark.

94.    When Novus informed SMDS of its decision, SMDS admitted that other GAINSWave licensees were doing the same thing.

95.    At this point, SMDS was fully entrenched in its anticompetitive agreement with TRT and believed that it could expand its market share and increase its revenue by focusing on its sham licensing scheme for the '127 patent—which it contended applied to the entire ESWT-ED Market—rather than trying to license the GAINSWave brand.

96.    To that end, SMDS demanded that Novus continue to pay a license fee ostensibly for the right to conduct any ESWT treatments of erectile dysfunction under the '127 patent, but it de-listed Novus from the GAINSWave directory. SMDS made the same demands on other GAINSWave licensees who wished to terminate their licenses.

97.    Unaware that SMDS's statements about the '127 patent were knowingly false, and to avoid protracted litigation, Novus reluctantly agreed to pay the monthly license fee for the '127 patent.

98.    Other Class members have likewise been damaged by the unlawful agreement between SMDS and TRT.

99.    Class members who are also GAINSWave licensees have paid unnecessary license fees and supracompetitive prices due to SMDS and TRT's sham threats to enforce the '127 patent against them.

100.    Class members who are not GAINSWave licensees have also been harmed, because, if SMDS and TRT competed instead of colluded, they would both aggressively market their ESWT brands to medical providers by lowering their prices and improving their services. This would result in less expensive and better

options for medical providers to provide ESWT treatments and, by extension, better and less expensive treatments for patients. In addition, absent the anticompetitive scheme by SMDS and TRT, competitors that were not threatened by the scheme's overbroad non-compete agreement would likely enter the market, causing the overall price of ESWT Programs to decrease and the quality of ESWT Programs to increase. Such entry would also increase the choice of options for treatment programs for Class members.

## CLASS ALLEGATIONS

101.   Novus brings this action on behalf of itself as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), and on behalf of similarly situated Classes. Novus seeks to represent the following Classes:

> **National Class:** All persons and entities who, for the period of at least September 17, 2018 through the present, were medical providers who used ESWT to treat erectile dysfunction within the United States.

> **California Subclass:** All persons and entities who, for the period of at least September 17, 2018 through the present, were medical providers in California who used ESWT to treat erectile dysfunction within the United States.

102.   Excluded from the Classes are the Court and its officers, employees, and any members of their immediate families; each Defendant and co-conspirator and any entity in which Defendant or any co-conspirator has a controlling interest, and their legal representatives, officers, directors, employees, assignees and successors, and relatives; any governmental entities; and counsel for Novus and the Classes, including their partners, employees, and agents.

103.   The Classes seeks compensatory damages against Defendant and, as appropriate, equitable, injunctive, and declaratory relief, and treble damages.

104.   The members of the Classes are sufficiently numerous such that joinder of all members is impracticable. The exact number of Class members is unknown to Novus at this time and can only be ascertained through appropriate discovery

because such information is in the exclusive control of Defendant and its co-conspirators. Novus believes that there are in excess of five hundred members of the nationwide Class located throughout the United States and in excess of fifty Subclass members in California. The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and to the Court.

105.   Novus's claims are typical of the claims of the other members of the Classes, as required by Federal Rule of Civil Procedure 23(a)(3), as all members of the Classes were similarly affected by Defendant's unlawful conduct. All members of the Classes suffered higher prices and reduced quality of services from brand providers in the ESWT-ED Market due to the unlawful agreement between SMDS and TRT.

106.   The factual and legal bases of Defendant's and the conspirators' misconduct are common to the members of the Classes and represent a common thread of misconduct resulting in injury to Novus and all members of the Classes.

107.   Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. The determination of the truth or falsity of those questions will resolve an issue that is central to the validity of a particular claim and will generate a common answer that is apt to drive the resolution of the litigation, within the meaning of and fulfilling the requirements of Federal Rule of Civil Procedure 23(a)(2).

108.   Among the questions of law and fact common to the Classes are:

a.    whether federal antitrust laws were violated by Defendant's and other conspirator's acts, practices, and anticompetitive conduct as alleged herein;

b.    whether Defendant participated in and pursued the common course of wrongful conduct complained of herein;

c.     whether Defendant engaged in a pattern and practice of deceptive and/or anticompetitive conduct;

d.     whether Defendant engaged in a course of conduct designed to neutralize or eliminate competition and to secure market power by entering an agreement to limit the availability of ESWT Programs in the United States;

e.     whether Defendant is liable to Novus and other members of the Classes for damages or other available relief under federal law; and

f.     the extent to which Novus and other members of the Classes have sustained damages and the proper measure of damages.

109.   Class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. Additionally, Defendant has acted or refused to act on grounds generally applicable to Novus and the Classes and require the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Classes, thereby making appropriate equitable relief to the Classes as a whole within the meaning of Federal Rules of Civil Procedure 23 (b)(2). There will be no material difficulty in the management of this suit as a class action.

110.   Novus and members of the Classes have all suffered, and will continue to suffer, harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy under Federal Rule of Civil Procedure 23(b)(3). Absent a class action, most members of the Classes likely would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law.

111.   Novus will fairly and adequately protect the interests of the members of the Classes as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs have retained counsel competent and experienced in complex litigation, class actions, and

antitrust litigation. Novus and its counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Novus nor its counsel have any interests adverse to those of the Classes.

### FIRST CLAIM FOR RELIEF

### Agreement to Restrain Trade

### (Sherman Act, Section 1, 15 U.S.C. § 1)

112.    Novus realleges each of the preceding paragraphs as if fully set forth herein.

113.    Novus brings this federal law claim on its own behalf and on behalf of each member of the proposed nationwide Class described above.

114.    SMDS and TRT reached an agreement (a) not to compete with each other, (b) to set a price floor for licensing the GAINSWave brand, (c) to jointly target other competitors with knowingly baseless assertions of patent infringement, and (d) to impose unreasonable restrictions on licensees to prevent them from using any other ESWT technology to treat erectile dysfunction.

115.    The agreement between SMDS and TRT has resulted in anticompetitive effects in the ESWT-ED Market, including fewer competitors and choices, higher prices, and diminished quality of services.

116.    Because SMDS and TRT are horizontal competitors in the ESWT-ED Market, their agreement is a *per se* violation of the antitrust laws.

117.    In the alternative, their agreement and conduct violates the antitrust laws under an inherently suspect, quick-look, or rule-of-reason analysis. The agreement between SMDS and TRT generated no efficiencies or other benefits to consumers. Any conceivable efficiencies the agreement may have created were substantially outweighed by its anticompetitive effects or could have been obtained through substantially less restrictive means. The true purpose and effect of the agreement was to implement naked restraints of trade, and the procompetitive benefits offered by Defendant and its co-conspirators are pretextual.

118.   As a direct, proximate, and foreseeable result of the agreement between SMDS and TRT, Novus and the Class have suffered and will continue to suffer harm to their businesses and property. Specifically, Novus and Class have paid and will continue to pay supracompetitive prices for ESWT Programs, including the payment of unnecessary license fees for the ostensible use of the '127 patent.

119.   The harm suffered by Novus and the Class constitutes antitrust injury because it is proximately caused by the lack of competition between SMDS and TRT and the overall anticompetitive scheme by these two entities as alleged. In other words, the injury suffered by Novus and the Class flows from the harm to competition.

## SECOND CLAIM FOR RELIEF

### Unfair Competition

### (Cal. Bus. & Prof. Code § 17200)

120.   Novus realleges each of the preceding paragraphs as if fully set forth herein.

121.   Novus brings this state law claim on its own behalf and on behalf of each member of the proposed California-wide Subclass described above.

122.   Defendant has engaged in unfair competition in violation of Cal. Bus. Prof. Code § 17200, et seq. As set forth above, Defendant has engaged in illegal conduct by violating the Sherman Act. That conduct is also unfair in that it violates the spirit and policy of the antitrust laws.

123.   As a direct result of Defendant's wrongful conduct, competition has been injured, including in the ESWT-ED Market, as alleged above. Moreover, this conduct threatens injury to downstream competition for price, innovation, and quality in the treatment of erectile dysfunction patients with ESWT, thereby injuring patients in California and elsewhere. These threatened injuries include the passing on to consumers of improperly inflated license fees and decreases in innovation and

quality competition due to the GAINSWave Membership Agreement's overbroad non-compete clause.

124.   As a direct result of Defendant's illegal conduct, Novus and the Subclass have suffered economic harm in the form of supracompetitive prices for ESWT Programs, including the payment of unnecessary license fees for the ostensible use of the '127 patent.

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (California Common Law)

125.   Novus realleges each of the preceding paragraphs as if fully set forth herein.

126.   Novus brings this state law claim on its own behalf and on behalf of each member of the proposed California-wide Subclass described above.

127.   To the detriment of Novus and the Subclass, Defendant has been and continues to be unjustly enriched as a result of the unlawful and/or wrongful conduct. Defendant is unjustly benefited by reducing competition and causing medical providers to pay higher licensing fees than they would in the absence of Defendant's anticompetitive conduct.

128.   Between the parties, it would be unjust for Defendant to retain the benefits attained by its actions. Accordingly, Novus and the Subclass seek full restitution of Defendant's enrichment, benefits and ill-gotten gains acquired as a result of the wrongful or unlawful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Novus requests that this Court:

1.   Enter an order certifying the Classes;

2.   Declare that SMDS's unlawful conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

3.   Declare that all SMDS's contracts or agreements that violate the

1  Sherman Act are void;

2       4.      Enjoin SMDS from continuing its unlawful acts;

3       5.      Award Novus and the Classes three times their actual damages against

4  SMDS under 15 U.S.C. § 15 in an amount to be determined at trial;

5       6.      Award Novus and the Classes compensatory damages as provided

6  under state law in an amount to be determined at trial;

7       7.      Award Novus and the Classes receive equitable relief in the form of

8  restitution and/or disgorgement of all unlawful or illegal profits received by

9  Defendant as a result of the anticompetitive conduct alleged herein;

10      8.      Award Novus and the Classes their costs and expenses of this action,

11  including their reasonable attorney's fees in bringing and pressing this case, as

12  provided under 15 U.S.C. §§ 15, 26 and other applicable law;

13      9.      Award Novus and the Classes pre- and post-judgment interest at the

14  applicable rates on all amounts awarded;

15      10.     Grant permanent injunctive relief to prevent the recurrence of the

16  violations for which redress is sought in this complaint; and

17      11.     Order any other such relief as the Court deems appropriate.

18

19  Dated:  April 3, 2020                    **ZUBER LAWLER & DEL DUCA LLP**

20                                            JOSHUA M. MASUR
                                              JAYASHREE MITRA
21                                            RASHEED M. MCWILLIAMS
                                              JAROD M. BONA
22                                            JON F. CIESLAK

23

24                           By: _____*/s/ Joshua M. Masur*_____

25                                            Attorneys for Plaintiff Novus Anti-Aging
                                              Center, Inc., on behalf of itself and all
26                                            others similarly situated

27

28

1

**DEMAND FOR JURY**

2
Plaintiff hereby demands a jury trial as to all issues and claims so triable.

3

4
Dated:  April 3, 2020                                    **ZUBER LAWLER & DEL DUCA LLP**

5
Joshua M. Masur

Jayashree Mitra

6
Rasheed M. McWilliams

7
Jarod M. Bona

Jon F. Cieslak

8

9
By:  _____/s/ Joshua M. Masur_____

10
Attorneys for Plaintiff Novus Anti-Aging Center, Inc., on behalf of itself and all others similarly situated

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28